UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KEVIN J. SLATTERY,            *
                               *
      Plaintiff,         *
                               *
     v.             *     Civil Action No. 17-cv-11187-IT
                               *
TOWN OF FRAMINGHAM, *et al.*,   *
                               *
      Defendants.    *

MEMORANDUM & ORDER

November 9, 2020

TALWANI, D.J.

Plaintiff Kevin Slattery, a former Deputy Chief with the Framingham Police Department ("FPD"), brought this action against the Town of Framingham[1]; Kenneth Ferguson, Chief of the FPD, in his individual capacity; and Steven Trask, Acting Chief of the FPD, in his individual capacity. Compl. [#1]. Plaintiff alleges that Chief Ferguson, Acting Chief Trask, and Framingham retaliated against him for his protected speech in violation of 42 U.S.C. § 1983 (Counts I-III) and that Framingham retaliated against him in violation of the Massachusetts Whistleblower Act ("MWA"), Mass. Gen. Laws ch. 149, §§ 185 *et seq.* (Count IV). He further alleges that Trask and Framingham discriminated against him based on his age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 (Counts V-VI), and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B (Counts VII-VIII), and based on his disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"),

---

[1] Framingham changed to a city form of government, effective January 1, 2018. See Notice of Name Change [#16].

42 U.S.C. § 12101 *et seq*. (Counts IX-X) and Mass. Gen. Laws ch. 151B (Counts XI-XII). And, finally, he alleges that Trask and Framingham violated his right to privacy under the Massachusetts privacy act, Mass. Gen. Laws ch. 214, § 1B (Counts XIII-XIV) and the Massachusetts fair information practices act, Mass. Gen. Laws ch. 66A, § 2 (Count XV).

Presently before the court are Framingham's <u>Motion for Summary Judgment</u> [#49] and Ferguson and Trask's <u>Motion for Summary Judgment</u> [#51]. For the following reasons, Framingham's motion is GRANTED, and Ferguson and Trask's motion is DENIED IN PART as to the claim brought against Trask under the Massachusetts privacy act (Count XIII) and GRANTED IN PART as to all other claims.

## I.      Standard of Review

Under Rule 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party . . . [and] [a] fact is material if it has the potential of determining the outcome of the litigation." <u>Baker v. St. Paul Travelers, Inc.</u>, 670 F.3d 119, 125 (1st Cir. 2012) (internal citation omitted). When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the nonmovant's favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). The court properly "give[s] no heed to speculative, unsupported, or unreasonable conclusions." <u>Showtime Entm't, LLC v. Town of Mendon</u>, 769 F.3d 61, 69 (1st Cir. 2014). The moving party is responsible for identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party shows the absence

of a disputed material fact, the burden shifts to the non-moving party to set forth "specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986).

## II.   Factual Background

### A.   *Key Players*

Plaintiff was hired as a patrolman with the FPD in 1985 and rose through the ranks from sergeant to lieutenant and eventually to Deputy Chief in 2013. Defendants' Statement of Material Facts ("Defs' SOF") ¶ 1 [#53][2]; Plaintiff's Statement of Material Facts to Which There Is a Genuine Issue ("Pl's SOF") ¶ 2 [#60]. As Deputy Chief, Plaintiff had a wide range of managerial responsibilities, including oversight of the Detective and Narcotics Units. Pl's SOF ¶ 4, 7 [#60]. Among other things, his duties required him to "insure that the integrity of the department [was] not compromised," to "supervise the daily activity of Departmental personnel," and to "monitor the quality of work performed for adherence to acceptable policing standards." Deputy Chief Job Description 4-8 [#1-9]. He also had authority to discipline subordinate officers in his chain of command for "violations of department rules, policies, orders, or procedures, not to exceed a suspension without compensation for five (5) days, and if necessary, with a recommendation to the Chief of Police that additional or greater discipline be imposed." Defs' SOF ¶ 28 [#53]. Plaintiff retired from the FPD on April 5, 2017. Id. at ¶ 88.

Defendant Ferguson joined the FPD in the same year as Plaintiff, was appointed Chief of Police in 2013, and retired in April 2018. Defs' SOF ¶ 2–3 [#53]. He was succeeded as Chief of Police by Defendant Trask, who joined the FPD in 1987 and had previously served as Acting

---

[2] Except as specifically noted, Plaintiff does not dispute Defendants' Statement of Material Facts for purposes of summary judgment. Supplemental Responses ("Pl's Resp.") [#66].

Chief when Defendant Ferguson was on sick leave in late 2016 through early 2017. Id. at ¶ 3-4; Madonna Report 6 [#60-44].

In addition to the parties, two other members of the FPD play important roles in the events at issue here. Sergeant Scott Brown and Officer Matthew Gutwill were, at all times relevant, members of the FPD Narcotics Unit who worked in a dual capacity as officers with a Drug Enforcement Agency ("DEA") task force. Moore Report 2 [#53-6]. Sergeant Brown was also the president of the Framingham Police Superior Officers Association ("Union"). Madonna Report 4 [#60-44].

This litigation takes place against a backdrop of intense "distrust and dysfunction" within the FPD, which has been "embroiled in a number of disputes between and among its officers and command staff" as well as "between the unions and the administration." Id. The court takes judicial notice that this is the third case in this session to emerge out of these ongoing conflicts. See Gutwill v. City of Framingham, No. 1:16-CV-12191-IT (D. Mass.); Stuart v. City of Framingham, No. 1:16-CV-12559-IT (D. Mass.).

B.    *Alleged Whistleblowing*

In 2011, Sergeant Brown was the defendant in a criminal trial, following allegations that he had brandished a firearm at civilians. Defs' SOF ¶ 2–3 [#53]; Pl's Depo. 44-45 [#53-3]; Moore Report 3 [#53-6]. Plaintiff, then a lieutenant, was involved in the investigation and testified against Brown, who was ultimately acquitted. Moore Report 3 [#53-6].

That same year, Plaintiff began to investigate the alleged wrongful conviction of a childhood acquaintance, Kevin O'Loughlin. Defs.' SOF ¶ 8 [#53]; Pl's Depo. 129 [#60-1]. The investigation resulted in a successful motion for a new trial in 2015, and the district attorney

subsequently filed a *nolle prosequi*. Pl's Depo. 129-30 [#60-1]. Plaintiff received an award for his work on the case. Id. at 130.

After he was promoted to Deputy Chief in 2013, Plaintiff investigated several alleged improprieties within the Detective and Narcotics Units, over which he had supervisory authority. Pl's SOF ¶ 4, 7 [#60]. In 2015, he became aware that a detective in the Narcotics Unit had allegedly failed to follow protocol when paying and tracking money spent on confidential informants. "Buy Funds" Email 10/2/15 [#60-7]; DeRosa Emails 5/2/16 3 [#60-9]. Plaintiff also investigated an alleged inappropriate relationship between that same detective and a confidential informant, as well as a possible conflict of interest between the detective and Attorney Brian Simoneau, Assistant to the Chief of Police. DeRosa Emails 5/2/16 3 [#60-9]; Defs' SOF ¶ 8 [#53]. He was additionally involved in investigating a theft by an officer from the FPD evidence room and an incident in which an FPD lieutenant allegedly told a subordinate to throw a suspect on the train tracks. Dubeshtar Emails 10/1/15 [#60-8]; Defs' SOF ¶ 8 [#53]; Pl's Depo 551 [#60-1]. He made at least some of these issues known to the Middlesex District Attorney's Office. DeRosa Emails 5/2/16 2-3 [#60-9].

C.   *Conflicts with Officer Gutwill and Sergeant Brown*

On January 29, 2016, Plaintiff notified Officer Gutwill that Gutwill was being rotated off the DEA taskforce. Defs' SOF ¶ 14 [#53]. Gutwill accused Plaintiff of lying about the reason for the rotation, then called Chief Ferguson and claimed that Plaintiff had perjured himself in his testimony against Sergeant Brown in the 2011 criminal case. Email to HR 2/6/16 [#53-4]. Plaintiff reported Gutwill to Human Resources for bullying and harassment several days later, id., and Gutwill, in turn, complained that Plaintiff had rotated him in retaliation for reporting corruption within the FPD. Moore Report 2-3 [#53-6].

On March 22, 2016, Sergeant Brown called Chief Ferguson to express his support for Gutwill's retaliation claim. Id. at 2. Ferguson informed Plaintiff of the conversation, and Plaintiff called Brown the next day. Id. at 3. The conversation grew heated, and Plaintiff accused Brown of spreading false information about him and trying to turn other members of the FPD against him. Defs' SOF ¶ 17-18. After the call, Brown filed a complaint against Plaintiff with Human Resources, and Plaintiff complained about Brown to both Chief Ferguson and Human Resources. Id. at ¶ 17, 20. Plaintiff also requested that Framingham provide him with counsel, given the gravity of the accusations against him. Request for Counsel 3/25/16 [#60-51]. Framingham hired Attorney Julie Moore to investigate the cross-complaints. Defs' SOF at ¶ 21.

D.      *First Sick Leave and Accommodations*

On March 28, 2016, Plaintiff took a sick leave of absence due to Lyme disease. Id. at ¶ 39-40. He was medically cleared to work half days as of April 20, 2016, and the FPD granted him that accommodation. Id. at ¶ 40-42.

E.      *"Let Him" Statement and Administrative Leave*

Shortly after he returned, on April 25, 2016, Plaintiff had a conversation with then-Deputy Chief Trask and Lieutenant Blaise Tersoni about whether Lieutenant Vincent Stuart might be interfering with an investigation into an incident concerning his daughter. Id. at ¶ 30. Plaintiff allegedly said "let him," which Tersoni took to mean that Plaintiff recommended that they let Stuart get himself into trouble. Id. at ¶ 30-32. Tersoni then filed a complaint against Plaintiff, and Plaintiff was placed on paid administrative leave on May 3, 2016. Id. at ¶ 32-34. The notice of suspension cited the "let him" comment and another instance of inappropriate behavior, where Plaintiff had allegedly tasked Framingham and FPD staff with providing information for his ongoing HR issues with Brown and Gutwill. Notice of Suspension [#53-10].

During the same time period, on April 27, 2016, Plaintiff sent an email to Chief Ferguson and Human Resources complaining about the FPD's decision not to provide him with legal representation in his ongoing conflict with Brown as well as the FPD's failure to investigate a civilian complaint lodged five years earlier against Sergeant Brown. Follow-Up Request for Counsel 4/27/16 [#60-16].

Plaintiff remained on paid administrative leave until October 27, 2016, at which point Chief Ferguson issued him a Letter of Counseling. Defs' SOF ¶ 35.

F.    *Second Sick Leave*

The same day that the administrative leave ended, Plaintiff provided Framingham with a doctor's note seeking excuse from work for two weeks "due to acute illness" of an unspecified nature. Sick Notes 2 [#53-14]. On November 8, 2016, he submitted another note requesting a month out of work. Id. at 3. A third note, submitted on December 1, 2016, specified the illness as "acute Lyme disease . . . exacerbated by work-related stress" and requested another two weeks of leave. Id. at 4. Between October 27, 2016 and April 3, 2017, Plaintiff submitted nine separate requests for sick leave, totaling approximately five months of leave. Id. at 2-10. He did not request any accommodations.

The FPD's Rules and Regulations allow the Chief of Police to order an employee to submit to a physical or psychological exam to determine the officer's fitness for duty, and in January 2017, Acting Chief Trask ordered Plaintiff to submit to a physical evaluation. Defs' SOF ¶¶ 55-56 [#53]. An independent medical examiner concluded that Plaintiff was not fit to return to work and that he could not think of "any reasonable accommodation(s) that would allow Mr. Slattery to perform the essential functions of his job as Deputy Police Chief." Id. at ¶ 59. The report went on to say that Plaintiff might be able to return to work in six to twelve months with

appropriate psychiatric treatment. External Medical Evaluation 5 [#60-41]. Plaintiff denied having any psychiatric issues and refused to undergo an independent psychiatric evaluation ordered by Acting Chief Trask. Defs.' SOF ¶ 62-64 [#53]; Pl.'s SOF ¶ 87 [#60].

G.   *Alleged Invasion of Privacy*

On January 27, 2017, Acting Chief Trask received from Human Resources a draft of a cover letter scheduling a Fitness for Duty exam for Plaintiff. Madonna Report 6 [#60-44]. That day, Trask saved a copy of the cover letter to a shared network drive that was accessible to all members of the FPD. Defs' SOF at ¶ 65; Pl.'s SOF ¶ 89-90 [#60]. The letter contained no medical records, but it was addressed to a psychiatrist and noted that Plaintiff had experienced significant personal loss, including the death of a child in infancy and the loss of his brother to suicide. Defs.' SOF ¶ 65, 68 [#53]; Pl.'s SOF ¶ 89-90 [#60].

On February 15, 2017, another member of the FPD informed Trask that the letter was accessible on the shared drive. Madonna Report 8 [#60-44]. Trask removed the letter that same morning but did not inform Chief Ferguson, Human Resources, or Plaintiff about the situation. Id.

On February 17, 2017, Sergeant Brown, who had seen the letter, emailed Human Resources, copying several Union members, asking for an update regarding the complaint that he had lodged against Plaintiff almost a year earlier. Id. at 9. The email referred to the cover letter, suggesting that Plaintiff might be feigning his medical issues in order to avoid the investigation. Id. Human Resources immediately contacted Trask and requested that the letter be removed from the shared drive, to which he responded that he had already done so two days prior. Id. Trask then called Chief Ferguson to let him know what had happened. Id.

That afternoon, Trask called Plaintiff and told him that the letter had been mistakenly posted to the shared drive. Id. at 10. When the matter was investigated, Trask reported to the investigator that when he talked to Plaintiff, he was unaware that the letter had been accessed by others. Id. Trask also falsely claimed that he had called Plaintiff the same day that he learned the letter was on the shared drive. Id. Trask's phone records and email established, however, that he did not call Plaintiff until two days later, after Brown had sent his letter to Human Resources. Id. At that point, Trask had been made aware that at least two officers, including Brown, had seen the letter prior to his call with Plaintiff. Id. at 8, 10.

In all, the letter was accessed by eighteen people while on the drive. Defs.' SOF ¶ 70 [#53]. Plaintiff conceded that "a lot of people knew about" the losses of his child and brother prior to the letter being placed on the shared drive. Pl.'s Dep. 1020 [#53-3]. However, members of the FPD, including Brown, would not otherwise have been aware of Plaintiff's medical issues. Madonna Report 9 [#60-44].

H.   *Involuntary Retirement Application*

On February 16, 2017, following the independent medical evaluation and Plaintiff's refusal of a psychiatric evaluation, Acting Chief Trask filed an application for Plaintiff's involuntary retirement based on superannuation (i.e., age) and disability, stating that Plaintiff was "permanently unable to perform the essential functions of his position." Pl.'s SOF ¶ 75 [#60]; Involuntary Retirement Application 4 [#60-35]. Trask told Plaintiff about the Involuntary Retirement Application at the same time that he told him that the cover letter had been posted on the shared drive. Madonna Report 10 [#60-44].

I.     *Suspension*

The next day, Attorney Moore reported the findings of her investigation into the cross-complaints between Plaintiff and Sergeant Brown. Moore Report 1 [#53-6]. The report concluded that Plaintiff had improperly threatened Brown with the intention of dissuading him from providing negative information about Plaintiff in the Gutwill investigation. Id. On March 3, 2017, Acting Chief Trask issued Plaintiff a Notice of Suspension, stating that Plaintiff was suspended without pay for two days for misconduct, specifying that Plaintiff's "speech and demeanor" during the March 23, 2016 telephone call with Brown were "unprofessional and fell below what is reasonably expected of a Deputy Chief of Police." Defs' SOF ¶ 24 [#53]. Plaintiff was still out on sick leave at the time, and the FPD payroll department was never notified of the suspension, so Plaintiff did not have any pay withheld as a result of this Notice of Suspension. Id. at ¶ 26.

J.     *Retirement Board Hearing*

The Retirement Board held a hearing on the involuntary retirement application on April 4, 2017, at which Framingham withdrew superannuation as a basis for seeking Plaintiff's involuntary retirement. Defs' SOF ¶ 74, 84 [#53]. Plaintiff presented the Retirement Board with a note from his physician, stating that he could return to work. Id. at ¶ 82. The Retirement Board, however, informed Plaintiff that he would have to go before the Medical Review Board to prove that he was not disabled. Id. at ¶ 86-87.

K.     *Retirement and Filling of Deputy Chief Position*

Rather than go before the Medical Review Board, Plaintiff applied for voluntary retirement the day after the hearing. Id. at ¶ 85, 88-89. In May 2018, more than a year after Plaintiff's retirement, Leslie Baker was appointed Deputy Chief. Id. at ¶ 79.

### III.    Discussion

A.    *Retaliation Claims*

1.    42 U.S.C. § 1983

Plaintiff alleges that Chief Ferguson, Acting Chief Trask, and Framingham retaliated against him for his protected speech, in violation of 42 U.S.C. § 1983. "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." Mercado–Berrios v. Cancel–Alegria, 611 F.3d 18, 25–26 (1st Cir. 2010) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)) (internal quotation marks and citations omitted). This stems from the fact that "[p]ublic employees do not lose their First Amendment rights to speak on matters of public concern simply because they are public employees." Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 765 (1st Cir. 2010) (quoting Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007)). But these rights are not absolute: "in recognition of the government's interest in running an effective workplace, the protection that public employees enjoy against speech-based reprisals is qualified." Mercado–Berrios, 611 F.3d at 26. To prove a prima facie case of retaliation, a public employee must therefore show (1) that he or she experienced an adverse employment action; (2) that the speech at issue was, in fact, protected; and (3) that the protected speech was a substantial or motivating factor in the alleged adverse employment action. See Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011).

a.    Adverse Employment Actions

Plaintiff contends that he was subjected to the following adverse employment actions in retaliation for his protected speech: (1) Chief Ferguson and Acting Chief Trask's investigation of him related to the phone call with Sergeant Brown; (2) Ferguson and Trask's investigation of him related to the "let him" statement; (3) his placement on paid administrative leave; (4) his

two-day suspension; (5) Trask's order that Plaintiff attend two independent medical evaluations; (6) Trask's filing of an involuntary retirement application against Plaintiff; and (7) Ferguson and Trask's failure to investigate Plaintiff's six complaints against other members of the FPD. Compl. ¶¶ 71, 82, 92 [#1]. Defendants counter that none of these qualify as adverse employment actions because "not every action that an employer takes that a public employee may dislike constitutes the kind of adverse employment action that can ground a First Amendment retaliation claim," and the actions alleged by Plaintiff do not "affect employment or alter the conditions of the workplace." Delaney v. Town of Abington, 890 F.3d 1, 6 (1st Cir. 2018) (quoting Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)) (internal quotations and alterations omitted). But while Defendants correctly identify the standard for substantive discrimination claims, "the standard for showing an adverse employment action is lower in the First Amendment retaliation context." Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004).

"The term 'adverse employment action' first developed in the Title VII context 'as a shorthand for the *statutory* requirement that a plaintiff show an alteration in the material terms or conditions of his employment.'" Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (quoting Bergeron v. Cabral, 560 F.3d 1, 7-8 (1st Cir. 2009)). The same requirement does not apply, though, where a claim is filed pursuant to § 1983 alleging a constitutional violation. Rather, the court's concern is to ensure that employees may not "chill individuals' exercise of constitutional rights." Powell v. Alexander, 391 F.3d 1, 16–17 (1st Cir. 2004). C.f. Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53, 70-73 (2006) (finding employment action "materially adverse" for purposes of Title VII retaliation claim where it was serious enough to dissuade employee from filing complaint). "Thus, the pertinent question in a § 1983 retaliation case based on the First Amendment is whether the defendant's actions would deter 'a reasonably

hardy individual[ ]' from exercising his constitutional rights." Barton, 632 F.3d at 29 (quoting

Agosto-de-Feliciano v. Aponte-Roque (1st Cir. 1989)).

Here, several of Plaintiff's alleged adverse employment actions could underpin a

retaliation claim. Internal investigations into an employee's conduct are sufficiently adverse to

support a claim of impermissible retaliation. See Rivera-Jimenez, 362 F.3d at 94-95. So are

placement on administrative leave and suspension, even where Plaintiff suffered no loss of

compensation: the potential social and professional consequences, as well as the disciplinary

record, could be enough to deter a reasonably hardy employee from engaging in protected

speech. See Barton 632 F.3d at 29-30 (collecting cases). Acting Chief Trask's filing of an

involuntary retirement application would also qualify, because "the threat of dismissal from

public employment is . . . a potent means of inhibiting speech." Pickering v. Board of Education,

391 U.S. 563, 574 (1968). And, if Plaintiff were able to demonstrate that he was improperly sent

for a Fitness for Duty examination, that too could constitute the type of retaliatory harassment

actionable under § 1983. See Barton, 632 F.3d at 29 ("Even 'relatively minor events' can give

rise to § 1983 liability, so long as the harassment is not so trivial that it would not deter an

ordinary employee in the exercise of his or her First Amendment rights") (internal citations

omitted). Where Plaintiff has identified a number of adverse employment actions, the court

therefore turns to whether the speech at issue is protected.

      b.     Protected Speech

Plaintiff identifies several instances of allegedly protected reporting: (1) his testimony

against Sergeant Brown during the 2011 criminal trial; (2) his participation in the wrongful

conviction investigation; (3) his reporting of numerous improprieties within the FPD; and (4) his

complaints about other FPD officers.

To be protected under the First Amendment, speech by a government employee must be made (a) as a citizen and (b) on a matter of public concern. See Decotiis, 635 F.3d at 30 (quoting Curran, 509 F.3d at 45 (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006))). In determining whether a plaintiff's speech was made as a citizen, rather than pursuant to official duties, courts consider non-exclusive and context-specific factors including "whether the employee was commissioned or paid to make the speech," "the subject matter of the speech, whether the speech was made up the chain of command, whether the employee spoke at her place of employment" and whether there is a citizen analogue to the speech. Id. at 32 (internal citations omitted). If, after applying these factors, the court finds that the plaintiff's speech was made pursuant to his official duties, there is no First Amendment claim because "when public employees make statements pursuant to their official duties, . . . the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421.

Plaintiff's testimony at the 2011 trial is unequivocally protected: "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." Lane v. Franks, 573 U.S. 228, 238 (2014). His participation in the wrongful conviction investigation could also fall under such protection where he went beyond his duties as a lieutenant in conducting the investigation to serve the important public interest of ensuring the validity of convictions. See id. at 240 ("The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties"). However, Plaintiff has not demonstrated that these instances of protected speech were "a substantial or motivating factor in the alleged adverse employment decisions." Decotiis, 635 F.3d at 29 (quoting Curran, 509 F.3d at 45). Quite to the contrary,

14

Plaintiff was promoted to Deputy Chief after his testimony at the 2011 trial and the initiation of the wrongful conviction investigation, and he was given an award for his work on the wrongful conviction investigation.

The more recent instances of allegedly protected reporting do not qualify as such under the Garcetti test. As Deputy Chief, Plaintiff had broad supervisory responsibilities. While the wrongful conviction investigation may have been outside the scope of his ordinary duties, the investigations of alleged improprieties in the FPD fall squarely within his responsibility to "insure that the integrity of the department [was] not compromised." The police investigations are therefore not protected speech, because they were part of Plaintiff's official duties. Nor are Plaintiff's misconduct complaints and grievances against other FPD members protected because "[t]his type of communication—complaints or concerns made up the chain of command—is the quintessential example of speech that owes its existence to a public employee's official responsibilities . . . ." Gilbert v. City of Chicopee, 915 F.3d 74, 83-84 (1st Cir. 2019).

In addition, while Plaintiff's more recent allegations shine an unflattering light on the FPD, they do not rise to the level of "matters of public concern." See Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc., 804 F.3d 59, 66 (1st Cir. 2015) ("To qualify as a matter of public concern, the speech (based on the content, form, and context) must touch on issues in which the public (even a small slice of the public) might be interested, as distinct, say, from purely personal squabbles"). Plaintiff cannot recast his employee grievances by invoking a generalized public interest in how public institutions are run. See Connick v. Myers, 461 U.S. 138, 154 (1983) (First Amendment does not empower public employees to "constitutionalize the employee grievance").

c.      Qualified Immunity and Municipal Liability

Where Plaintiff has failed to show (1) that his protected reporting was a substantial or motivating factor in the adverse employment actions taken against him, and (2) that the remaining speech at issue was protected, the court need not address Chief Ferguson and Acting Chief Trask's qualified immunity defenses.

Similarly, where he has failed to make out a viable First Amendment retaliation claim, the court need not consider his municipal liability claim. See Evans v. Avery, 100 F.3d 1033, 1039 (1st Cir. 1996) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)).

2.      Massachusetts Whistleblower Act

Plaintiff's retaliation claim against Framingham, brought under the MWA, fails for similar reasons. The MWA provides that a public employer may not retaliate against an employee who (1) discloses, or threatens to disclose to a supervisor or to a public body a practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment; (2) provides information to or testifies before a public body conducting an investigation into any violation of law or risk to public health, safety or the environment; or (3) objects to or refuses to participate in any activity which the employee reasonably believes is in violation of law or poses a risk to public health, safety or the environment. Mass. Gen. Laws ch. 149, § 185(5). The type of reporting that the MWA seeks to protect is that wherein a subordinate becomes aware of a violation and reports it to a supervisor who has the power to remedy it. Id. § 185(4) (defining "supervisor" as someone "who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains").

As above, Plaintiff has not demonstrated that he was retaliated against for his testimony at the 2011 trial or his work on the wrongful conviction investigation because he was subsequently promoted and commended for his efforts. Turning to his more recent reporting of improprieties within the FPD, Plaintiff fails to allege that he "disclosed or threatened to disclose" to an FPD supervisor or a public body any wrongdoing within the FPD in the manner contemplated by the statute. While Plaintiff may have undertaken the investigations because of improprieties within the FPD and may have involved Chief Ferguson and Acting Chief Trask, he did so pursuant to his duties as a Deputy Chief to take corrective action in the units over which he had supervisory authority. And regarding the internal misconduct reports and grievances, those also fall outside of the protections provided by the MWA, as they do not rise to the "requisite level of public concern" necessary to form the basis of a wrongful discharge claim. GTE Products Corp. v. Stewart, 421 Mass. 22, 33 (1995). See King v. Driscoll, 418 Mass. 576, 583 (1994) ("internal administration, policy, functioning, and other matters of an organization cannot be the basis" for retaliatory discharge claim).

     B.    *Discrimination Claims*

In addition to his whistleblower claims, Plaintiff's Complaint [#1] alleges that Acting Chief Trask and Framingham discriminated against him based on his age, in violation of the ADEA and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B ("ch. 151B"), and based on his disability, in violation of the ADA and ch. 151B.

Under all three statutes, courts apply a three-step burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973) (McDonnell Douglas). See also Yee v. Massachusetts State Police, 481 Mass. 290, 294 (2019) (applying McDonnell Douglas framework to claim brought under ch. 151B). First, a plaintiff must establish a prima

facie case of discrimination, the elements of which vary depending on the nature of the claim. See e.g., Rinsky v. Cushman & Wakefield, Inc., 918 F.3d 8, 29 (1st Cir. 2019) (ADEA); Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 82 (1st Cir. 2008) (ADA). Second, if the plaintiff meets this burden, a presumption of discrimination arises, and the burden shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802. Third, if the defendant meets its burden, the presumption dissolves, and the burden shifts back to the plaintiff to prove that the defendant's proffered non-discriminatory reason is a pretext for unlawful discrimination. See id. 804-05.

Plaintiff's age and disability discrimination claims are based on Acting Chief Trask's filing of the involuntary retirement application against him. Defendants argue that filing the application cannot be an adverse employment action where Plaintiff was not in fact terminated as a result; he voluntarily retired. Defendants are correct that for purposes of a discrimination claim "a plaintiff must show, among other things, that he suffered an 'adverse employment action' on account of a protected ground." Morales-Vallellanes, 605 F.3d at 35 (quoting García v. Bristol–Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008)). In this context (unlike in the retaliation context), an adverse employment action "typically involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). The filing of the involuntary retirement application does not amount to a change in the terms of employment.

Plaintiff counters that by filing the application, Acting Chief Trask created a working environment so intolerable that he felt forced to resign. To support a claim of constructive

discharge, a plaintiff must show that his "working conditions were 'so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 28 (1st Cir. 2002) (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir.1977)). The court need not consider whether a reasonable person in Plaintiff's shoes would have felt compelled to resign, however, because Plaintiff has failed to offer evidence from which a jury could also find that Defendants' proffered non-discriminatory reason for filing the involuntary retirement application—Plaintiff's refusal to attend a Fitness for Duty examination—was pretextual. See Cham v. Station Operators, Inc., 685 F.3d 87, 95–96 (1st Cir. 2012) (quoting Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 100 (1st Cir. 2007)) ("We may 'bypass the prima facie case issue because it is clear that plaintiff has not mustered enough evidence for a reasonable jury to conclude that [the defendant's] stated reason' for the employment action was pretextual").

After his administrative leave ended in October 2016, Plaintiff submitted nine requests for sick leave. Three months into this leave, Acting Chief Trask ordered Plaintiff to undergo a Fitness for Duty examination, and the medical examiner found Plaintiff unfit to return to work without psychiatric treatment. Plaintiff disagreed with this assessment, contending that he did not have a psychiatric problem and that, in any case, the medical examiner was not qualified to make that determination because he was not a psychiatrist. Acting Chief Trask then ordered Plaintiff to undergo another Fitness for Duty examination with a qualified psychiatrist, which Plaintiff refused to attend.

Where an existing employee has taken a disability leave of absence, an employer is permitted "to demand medical certification of ability to return to work." Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 676–77 (1st Cir. 1995). Given Plaintiff's long absence from work, it

was permissible for Acting Chief Trask to obtain the first medical evaluation. Having then received a report that Plaintiff was unfit and a response from Plaintiff that the doctor did not have the requisite qualifications to make that determination, Acting Chief Trask sought a follow-up evaluation. It was only after Plaintiff refused to attend this assessment that Trask filed the involuntary retirement application. Plaintiff has offered no evidence to suggest that Trask's reason for this filing was pretextual and that the real reason for the filing was either age or disability discrimination. Because Plaintiff refused to undergo a permissible examination, and because he has not shown that Trask's filing of the involuntary retirement application was based on a reason other than this refusal to undergo the examination, he has not met his burden of proving discriminatory pretext.

      C.    *Invasion of Privacy Claims*

Finally, Plaintiff bring three invasion of privacy claims: two against Acting Chief Trask and Framingham under the Massachusetts privacy act, Mass. Gen. Laws ch. 214, § 1B, and one against Framingham under the Massachusetts fair information practices act, Mass. Gen. Laws ch. 66A, § 2.

      1.    Massachusetts Privacy Act

Under State law, "a person shall have a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. "To fall under the protection of the statute, the disclosed facts must be of a highly personal or intimate nature." Taylor v. Swartwout, 445 F. Supp. 2d 98, 103 (D. Mass. 2006). "[H]owever, there can be no invasion of privacy where the facts, though highly personal, are already in the public domain." Id.

Defendants argue that Plaintiff's claim fails because his loss of a child during infancy and of his brother to suicide were already known within the FPD. Plaintiff counters that nobody in

the FPD knew that he was being sent for a psychiatric evaluation. The court agrees that Plaintiff had a privacy right as to this information. See Bratt v. Int'l Bus. Mach. Corp., 392 Mass. 508, 521 (1984) (recognizing a patient's valid interest in preserving the confidentiality of medical facts relayed to physician).

Defendants claim next that Plaintiff waived his privacy rights by appending the letter, as well as extensive medical records, to his Complaint [#1], making the information available to anyone with a PACER account. See Cronin v. Town of Amesbury, 895 F. Supp. 375, 391 (D. Mass. 1995), aff'd, 81 F.3d 257 (1st Cir. 1996) (plaintiff's use of pornographic letter as exhibit at public hearing waived his privacy interest in said letter). That argument is unconvincing: the violation at issue is the publication of the letter to the shared drive, which pre-dated the filing of the Complaint [#1]. In contrast, in the case cited by Defendants, it was the plaintiff who insisted upon a public hearing at which the supposedly private information was shared. Id. In addition, the analysis in the case cited by Defendants concerns only the plaintiff's constitutional invasion of privacy claims; the State claims were dismissed for lack of jurisdiction. Id. at 390-92.

Defendants further argue that even if there was an invasion of privacy, Acting Chief Trask is entitled to common-law discretionary function immunity. Under Massachusetts law, immunity is afforded to discretionary functions, which "includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." Duarte v. Healy, 405 Mass. 43, 50–51, 537 (1989) (quoting Patrazza v. Commonwealth, 398 Mass. 464, 468-69 (1986)). This immunity also covers "negligence or other error in the making of that decision." Gildea v. Ellershaw, 363 Mass. 800, 820 (1973). And the Massachusetts Supreme Judicial Court has specified that such immunity bars claims brought under the privacy statute where public

officials "acted in good faith, engaging in activity that was within their discretion." Nelson v. Salem State Coll., 446 Mass. 525, 538 (2006).

Plaintiff does not contest that Acting Chief Trask was engaging in an activity within his discretion nor that a negligence claim is barred, but he asserts that Trask acted maliciously in posting the letter on the shared drive. As support for this, Plaintiff points to multiple interviews in which FPD officers stated that they believed Trask saved the letter on the drive intentionally. Plaintiff offers no basis, however, for why that opinion evidence would be admissible, and the court declines to consider it on summary judgment. See Noviello v. City of Bos., 398 F.3d 76, 84 (1st Cir. 2005) ("as a rule '[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment'") (quoting Vazquez v. Lopez–Rosario, 134 F.3d 28, 33 (1st Cir.1998)).

However, based on other evidence in the record, the court nonetheless concludes that a reasonable jury could plausibly find Acting Chief Trask's claim that he accidentally placed the letter on the shared drive not credible. First, Trask understood his obligation to maintain material related to the psychiatric exam confidential, as the related Fitness for Duty letter was password protected, Trask did not save that document to the shared drive, and Trask admitted to the Framingham investigator that he was aware of the sensitivity of the letter to the psychiatrist and was working on it behind a closed door. See Madonna Report 8 [#60-44]. Second, the employee who first reported the letter's publication told the investigator that four officers were with him when one suggested to the others that they should look at the letter on the shared drive, and that he reported the matter to Trask the next morning. See id. at 8-9 [#60-44]. Yet Trask told the Investigator that when the employee made this report, Trask believed that only one member of the FPD had seen the letter in the two and a half weeks that the letter had been on the shared

drive. Id. at 8. Third, when Trask learned two days after the report was made to him that Human Resources had independently become aware that the letter had been widely shared and requested that Trask inform Plaintiff, Trask incorrectly stated that he had already called the Plaintiff.  Id. at 10. Then, when Trask called Plaintiff, Trask stated that he had removed the letter as soon as he became aware that it was on the shared drive and that he did not know whether the letter had been accessed by anyone else. Id. at 10. But that is not consistent with the timeline: Trask already knew by the time that he called Plaintiff that multiple people had viewed the letter on the drive. Id.

In sum, though the evidence is sparse, it is sufficient to leave the question of fact as to Trask's intent to a jury. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). Summary judgment is therefore inappropriate as to Count XIII against Trask.

Defendants are correct, however, that Count XIV, which alleges violation of the MWA against Framingham, is barred by the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws 258, § 10(c). Under the MTCA, employers are "immune from intentional tort claims," including intentional invasion of privacy. Spring v. Geriatric Auth. of Holyoke, 394 Mass. 274, 285 (1985). See also Billing v. Martha's Vineyard Pub. Charter Sch., No. 13-CV-11273, 2014 WL 69867, at *5 (D. Mass. Jan. 8, 2014) (concluding that public employers are immune from suits arising from intentional tort, including invasion of privacy under Mass. Gen. Laws c. 214, § 1B, pursuant to the MTCA).

2.      Massachusetts Fair Information Practices Act

Defendants argue that this statute doesn't apply to municipal governments. They are correct. See Spring, 394 Mass. at 280 ("G. L. c. 66A was not intended to apply to 'units of county, city or town governments'").

## IV.     Conclusion

Framingham's Motion for Summary Judgment [#49] is GRANTED, and Chief Ferguson and Acting Chief Trask's Motion for Summary Judgment [#51] is DENIED IN PART as to Count XIII and GRANTED IN PART as to all other claims.

IT IS SO ORDERED.

November 9, 2020                                              /s/ Indira Talwani_____
                                                                          United States District Judge

24